**THE ROB.**

**THE JOHN D. SCHOONMAKER.**

**W. E. HEDGER TRANSP. CORPORATION v. CORNELL STEAMBOAT CO.**

**THE E. PHALEN, JR.**

**THE TOP SERGEANT.**

**M. & J. TRACY, INC., v. CORNELL STEAMBOAT CO. et al.**

**Nos. A–15771, A–15788.**

District Court, E. D. New York.

March 20, 1940.

196

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for W. E. Hedger Transp. Corporation.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for Cornell Steamboat Co.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for M. & J. Tracy, Inc.

BYERS, District Judge.

On June 11, 1939, at about 8:25 p. m., daylight saving time, a northbound tow of the Cornell Steamboat Company (hereinafter called Cornell) passed a southbound tow of the W. E. Hedger Transportation Corporation (hereinafter called Hedger) in the Hudson River, off Magdalen Island on the east shore, which is nearly two miles south of a point opposite Saugerties.

The passing was during an unusually heavy squall which accompanied a thunder storm, and involved a collision between the last barge in the starboard rank of the Cornell tow, and the second barge in the five barge single line tandem Hedger tow, whereby ensued these two causes in Admiralty.

A–15771

Hedger, as owner of the said five loaded barges in tow of its tug "Top Sergeant", sues Cornell and its tugs "Rob" and "John D. Schoonmaker" (the towing vessels of the northbound tow) because it is alleged that they caused the tail of their tow to swing over toward the libelant's tug and her tow, causing the said collision, whereby each of the barges in libelant's tow was damaged.

The material faults alleged as to Cornell are that its tugs were unable to control their tow and were overloaded, and that they were not furnished with assisting tugs to enable them to control their tow. And as to the tugs:

That there was a failure to navigate with due regard to the safety of other vessels and to take into consideration existing conditions; that the tugs were attempting to tow too many boats and were overloaded, and that they failed to have helpers, and to take proper positions with respect to their tow, and failed to keep the latter in line.

At the trial, the libel was amended to allege, as an additional fault, that the Cornell tow failed to keep to the starboard side of a narrow channel; and the answer of Cornell was also amended to allege the same fault against Hedger, because the tows passed to starboard. It may be said at once on this subject, that a starboard passing was agreed to, and was proper.

A–15788

M. & J. Tracy, Inc. (hereinafter called Tracy) as owner of the barge "E. Phalen, Jr.", sues to recover its damages from the Cornell tugs "Rob" and "John D. Schoonmaker" and the Hedger tug "Top Sergeant", because the barge "E. Phalen, Jr.", being the last vessel in the starboard rank of the Cornell tow, came in contact with the Hedger tow.

The material faults alleged are:

(a) As to the Cornell tug "Schoonmaker", that she navigated too close to the Hedger tow and attempted to pass at close quarters, and failed to agree upon a safe passage, and failed to stop and reverse when the Hedger tow was observed, and that, having the "Phalen" in tow, it caused and allowed the same to become damaged.

(b) As to the Hedger tug "Top Sergeant", failure to avert the sheer of the barges in its tow, and that a passing was attempted in close quarters, and that there was a failure to agree upon a safe passage, and a failure to stop and reverse her engines when the Cornell tow was observed.

(c) As to the Cornell tug "Rob", carelessness, incompetence and inattention as assisting tug to the Cornell tow.

The defense of Hedger to this cause is that the northbound Cornell tow was

so close to the west side of the Hudson River that a starboard passing was required, and that the Cornell tugs allowed the tail of their tow to swing over toward the "Top Sergeant", and consequently responsibility is to be attributed to the Cornell tow.

The Cornell answer is common to both causes, and pleads that the navigation was proper and in accordance with custom, namely, that its tow was passing up the Barrytown channel on the easterly side of the shoal known as The Flats, and when in the vicinity of Barrytown the Cornell tugs hauled to the westward and shaped a course up the westerly side of the main channel off Turkey Point and continued to hold a course along the westerly side of the channel opposite Cruger Island and along the shoal known as Saddle Bags, which was customary, there being a flood tide; and that, when that course was initiated, there was a light south or southwesterly breeze, and that the Cornell tugs had ample power to handle their tow under all conditions which were reasonably to be anticipated; that, when the Hedger tow was observed, bound southerly, it was well above Magdalen Island and holding a course heading down the river on the easterly side of the channel above Saddle Bags Shoal, and that the respective courses would admit of a safe starboard passage with a clearance of about 400 feet; and that when the respective tugs were nearly abreast of each other "a sudden and wholly unexpected gale of extraordinary force and velocity struck approximately out of the west-northwest, and, catching the light boats on the port side of the Cornell tow, immediately caused the tow to swing rapidly across the channel to the eastward. In that sudden and unexpected emergency which had developed without any warning, the only safe means available to the Cornell tugs for avoiding disaster was to continue holding as far to the westerly as possible in an effort to pull their tow clear of the downbound tow." That the effort was unsuccessful and that the extraordinary and unusual gale threw the tow across the channel to the eastward, whereby the collision was caused. Thus is made the defense of force majeure.

The defense has been quoted because it explains the Cornell navigation and indicates the question for decision.

The facts are not substantially in dispute, and leave for determination the single question of whether the evidence sustains the defense pleaded.

It is not deemed important to discuss whether there is a different quantum of proof required as between Cornell and Hedger in the one case, and Cornell and Tracy in the other, based upon the fact that Cornell, as the tower, was not an insurer of the Tracy barge "Phalen", and is not liable to her owner in the absence of proof of negligence in respect of her damage (Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699), while as to Hedger she must excuse herself for the collision as having been an almost inevitable happening under the prevailing conditions. The causes were tried together, by consent, and the evidence has been weighed with a common requirement of persuasiveness.

The Cornell tow was made up of the "Schoonmaker" and the "Rob" and twelve barges arranged in seven tiers of two vessels each except as to the third and fifth tiers (perhaps it was the fifth and seventh but this is not important), from the starboard side of which tow two barges had been removed shortly before the Cornell tow crossed to the westerly side of the river at about Barrytown.

In the starboard rank of barges, two were loaded, and the "Phalen", being the last of the tow on that side, was carrying about 400 tons of coal, which was less than half of her 1400-ton capacity; all of the barges in the port rank were light, and their respective freeboards were from ten to twelve feet.

The "Schoonmaker" had 200-foot hawsers leading to the outside corners of the two head barges; the "Rob" was alongside the "Schoonmaker" to starboard and had a 200-foot hawser leading to the inside head corner of the starboard head barge, and a breast-line to the "Schoonmaker".

The tow was so made up at Barrytown, where the "Rob" joined the "Schoonmaker", and the crossing from the easterly to the westerly side of the river took place in that vicinity, and the tow proceeded alongside the black buoys marking the westerly edge of the channel.

That this was the customary practise for northbound tows was not controverted by libelants' evidence.

From Cruger Island northward to the northerly end of Magdalen Island, the channel is of a width of from 1050 to 1100 feet.

When the Cornell tow had almost reached black buoy 11, the Hedger tow was made out, bound south, and there were no passing signals exchanged, but it was observed that the latter steered a course for a starboard passing, and this, from all the testimony, seems to have been the customary and expectable procedure.

As the tows approached, there was no reason apparent to the navigators of either, why the passing should not be safely accomplished with ample clearance. It should be said that all the vessels in both flotillas carried proper lights, which were burning. It will be recalled that the collision occurred about 8:25 p. m., daylight saving time, and until the rapid onset of a squall out of the southwest there was no impairment of visibility. That squall accompanied a thunder storm which had been heralded by a heavy bank of black clouds in the west and southwest, observable for about fifteen minutes before the squall struck.

As the Cornell tow was observed from the pilot-house of the Hedger tug during the period of approach, it was seen that the vessels in the former tow, abaft the second tier, were sagging toward the easterly edge of the channel but, in view of the width of navigable water which has been stated, it was not deemed hazardous for the Hedger tug to proceed as she did, slowly and under one bell, as the flotillas neared each other.

When the towing vessels were about abreast, and the Cornell tugs were heading into what had become a northwest wind, the squall struck and the rain came down in such volume as to shut out the Cornell tow from the pilot-house of the Hedger tug.

There is no precise evidence as to the sudden force of the wind at that time, but it was estimated by the captain and pilot of the Hedger tug at not less than 40 miles per hour while it lasted, and by the neutral witness Davis, a tug captain, who was navigating just ahead of the Cornell tow, as an unusual blow of gale force.

That wind took effect upon the high port sides of the Cornell tow to such an extent that the rear end vessels were blown into the course of the Hedger tow and, in spite of the latter's hugging Magdalen Island to within 100 or 150 feet, the "Phalen" in the Cornell tow, and the second barge in the Hedger tow came in contact, that is, the starboard bow corner of the "Florence Hedger" struck the starboard side of the "Phalen" between amidships and the stern of the latter; thus clearance was lost by from 25 to 35 feet.

At the moment of impact, the Hedger tug had stopped and her towing hawsers dropped in the water, so that the "Phalen" rode over them. The wind moved the Hedger tug toward Magdalen Island during this short interval of time.

The only whistle signals were one or two five-blast alarms blown by the Hedger tug just prior to the impact, but they were not heard on the Cornell tugs which were then a matter of 800 or 900 feet northerly from the Hedger tug. Both tows proceeded promptly thereafter, and the fact that there had been a collision was not discovered by the Cornell tugs until the "Phalen" was taken out of that tow for delivery at Saugerties, which was her destination.

The faults finally relied upon by Hedger are that the Cornell tow proceeded as made up without knowledge of the weather forecast for Eastern New York, which was to the effect that thunder storms were to be expected; and that the helper tug "Rob" should not have been towing on a hawser but either should have been alongside and to starboard at the end of the Cornell tow or, if she were to assist at the head of the tow, she should have been made fast alongside the "Schoonmaker", only so that she could have been cast loose speedily when the weather conditions became alarming, and have dropped astern without delay so as to assist in holding the rear end of her tow toward the westerly side of the channel when the storm actually broke, since in that position she could the more readily have helped to keep the tow in line behind the "Schoonmaker".

Tracy argues fault against the Hedger tug "Top Sergeant" in that she proceeded from broader into narrower waters off Magdalen Island to a starboard passing, having observed from a safe distance the approach of the Cornell tow in the shape that has been described, in the presence of storm clouds in the southwest which

should have constituted warning of the hazardous conditions which later did obtain.

The evidence shows that, as the storm broke, the wind rapidly shifted from the southwest, whence it had been blowing lightly all the afternoon, into the west and northwest, which was its direction when its velocity reached the estimated figures which have been stated.

Having in mind the serious and substantial burden of proving the existence of conditions which should excuse what would otherwise be fault on the part of the Cornell towing vessels, the following matters require consideration:

Storm warnings: The morning newspapers of June 11, 1939, are assumed to have carried the forecast for Eastern New York as follows: "Showers and thunder storms this afternoon and tonight, slightly cooler tonight; Monday fair."

If knowledge of that forecast be imputed to Cornell and the masters of its tugs, this means that, when departure of the tow was had from Kingston at about 6:00 p. m. with flood tide under foot of about one mile per hour or perhaps a little better, it was to be anticipated that thunder storms "this afternoon and tonight" would occur in Eastern New York.

There is no testimony to the effect that such a warning should have induced the tow to remain in Kingston, or that special precautions should have been taken on the theory that it was hazardous to undertake the trip at all. Such an argument would have to be buttressed with convincing authority to demonstrate that navigation on the Hudson River in the face of probable thunder storms should be suspended, or undertaken only at the risk of dire peril. The most that can be said for this argument is that the warning 'meant that there might be a westerly blow of greater or less duration at some time during the afternoon or night of June 11th, as an incident to one or more thunder storms, for customarily that is the quarter from which a squall comes. It cannot be said—nor indeed is it seriously argued—that this warning taught that such a wind force as actually descended from the west was an inevitable happening with which the Cornell tugs had to reckon.

Hedger relies heavily upon The Patrick A. Dee, 2 Cir., 50 F.2d 393, 394, in which the neglect of the offending tug was held to consist in its failure to observe and make ready for an approaching storm. That tug had a loaded carfloat alongside to starboard, and stopped her engines, and lay to for between five and ten minutes off a railway terminal in Jersey City, waiting for a float-bridge to empty. The evidence was held to have established the necessity for her to make ready for the approaching storm; when that struck the tug and her carfloat they drifted into another tow. The court says that the No. 16 had neglected to do something in advance (just what is not indicated) and, in view of that neglect, the defense of inevitable accident was not made out. The opinion refers to the overwhelming evidence that the natural and usual indications which precede such a storm were multiplying around the tug's captain who saw and heard none of them and placed his tug and tow broadside to the wind, "stopped his engines, and lay to in a position quite as vulnerable as he well might have been had he deliberately prepared for disaster".

In contrast to the showing of this record, it is to be observed that the captain of the Cornell tug "Schoonmaker" had been aware for fifteen minutes of the black clouds in the southwest, and did *not* stop his engines but continued in his course in the belief that it was the safest thing for him to do. It has not been shown that, because of the presence of the black clouds, he should have sent the "Rob" back alongside the end of his tow, because that would have meant a loss of headway during the maneuver of casting loose the "Rob", and it was to maintain his headway that he relied upon the power of the two tugs to pull his tow out of the path of the Hedger tow. His judgment was vindicated by the testimony of other navigators who were examined on the subject.

The evidence does not demonstrate that the mere presence of the black clouds in the western sky taught the severity of the squall which accompanied the thunder storm. Unless the failure to anticipate the approximate wind force which accompanied the squall is thought to be the equivalent of the lack of care ascribed to the captain of "The New York Central No. 16" in the quoted case, that decision cannot be regarded as condemning the failure of the "Schoonmaker" to presuppose the inevitability of the accident which actually did occur.

The testimony of the captain and pilot of the Hedger tug, as given before the Steamboat Inspectors, and not repudiated at the trial, is far more persuasive in a practical sense, than the argument of counsel. Those men were present and participated in this happening and their statements, that the Cornell tow did everything that could be expected under the circumstances, are persuasive of the true extent of the unusual nature of this happening, and are of material assistance in reaching a conclusion as to the merits of the case for Cornell.

Upon all the evidence, it is concluded that, even though to Cornell there should be imputed knowledge that thunder storms had been forecast for Eastern New York, which includes the Hudson River, and that a string of light barges on the port side of the tow would have high sides presenting a fair target to a westerly blow, none-the-less the strength and severity of the squall which actually took effect were not reasonably to be anticipated, and that the strength of the blow, and the suddenness with which it actually manifested itself, were of such unusual severity, that the defense of inevitable accident has been made out.

The findings are:

A. The Cornell tow was properly made up, and the tugs "Schoonmaker" and "Rob" were of sufficient power to perform their duties as towing vessels on June 11, 1939, at the time this collision occurred.

B. The navigation of the Cornell tow was proper and in accord with prevailing custom and practise, and the requirements of sound seamanship.

C. The damage to the Tracy barge "Phalen" was not due to negligence on the part of the Cornell tugs.

D. The collision with the Hedger tow was not the result of inattention to duty on the part of the Cornell tugs or tow, but to an unforeseen manifestation of natural forces constituting force majeure.

E. The damage to the "Phalen" was not caused by any act or omission on the part of the Hedger tug or tow, and the navigation of the Hedger tug and tow was not faulty.

Conclusion.

Both libels must be dismissed with costs to be taxed.

Settle decree.